[Crim. No. 713.   Second Appellate District, Division Two.—April 1, 1920.]

## In the Matter of the Application of BODO TAHBEL for a Writ of Habeas Corpus.

[1] CONSTITUTIONAL LAW — RIGHT TO COMPEL WITNESS TO TESTIFY — LIMIT OF POWER OF LEGISLATURE.—Every person is subject to the power of the legislature to compel him in any judicial proceeding to give testimony of any fact within his knowledge and material to the issue, except in so far as the constitution restrains the exercise of this power, or protects the individual from compulsory compliance with its attempted exercise. The constitution of this state has limited the extent to which the legislature may exercise this power, and has given the individual protection against its exercise by providing, in article I, section 13, that "no person shall be compelled in a criminal case to be a witness against himself."

[2] ID.—REFUSAL TO ANSWER INCRIMINATING QUESTIONS—RIGHT OF WITNESS.—Any person, whether a party or stranger to the litigation, either in a civil action or a criminal proceeding, may, if he sees fit, refuse to answer any question the answer to which, if true, will render him punishable for crime, or which, in any degree, may tend to establish a public offense with which he might be charged.

[3] ID.—CRIMINAL PROCEEDING—SCOPE OF CONSTITUTIONAL PROVISION. To bring a person within the immunity of section 13 of article I of the constitution, it is not necessary that the examination of the witness should be had in the course of a criminal prosecution against him, or that a criminal proceeding should have been commenced and be actually pending. It is sufficient if there is a law creating the offense under which the witness may be prosecuted.

[4] ID.—JUVENILE COURT PROCEEDING—REFUSAL OF MINOR TO ANSWER INCRIMINATING QUESTIONS.—The juvenile court law does not, and could not, justify the detention of a minor in a juvenile home for refusal to answer incriminating questions in a proceeding under that law.

[5] ID.—NATURE OF PROCEEDING—RIGHT TO PROSECUTE UNDER GENERAL LAWS.—While a proceeding against a minor to have him adjudged a ward of the juvenile court is not a criminal proceeding, even though the violation of a penal law of the state be one of the grounds set forth in the petition therefor, that fact does not

1. Constitutional guaranty against self-incrimination; equivalent exemption to witness, note, 1 L. R. A. (N. S.) 167.

deprive such minor of the right to refuse to answer incriminating questions, as, under the juvenile court law, such proceeding may be dismissed and the minor prosecuted under the general law.

[6] ID.—POWER OF JUVENILE COURT OVER WARD—REFUSAL TO ANSWER INCRIMINATING QUESTIONS.—Even though a minor has been duly adjudged to be a ward of the juvenile court, the court would not, for that reason, have the power to commit such ward to a detention home merely because he might see fit to exercise one of his constitutional prerogatives.

PROCEEDING on Habeas Corpus to secure the release of a minor detained in a juvenile home for refusal to answer incriminating questions. Minor discharged.

The facts are stated in the opinion of the court.

Paul W. Schenck for Petitioner.

J. W. Joos, Deputy District Attorney, for Respondent.

FINLAYSON, P. J.—By his petition for a writ of *habeas corpus,* the petitioner, Henry Tahbel, father of Bodo Tahbel, a boy fifteen years of age, seeks his son's release from "Juvenile Hall," a detention home, in the city of Los Angeles, established under the juvenile court law as a place for the confinement of delinquent minors, and to which the boy was committed for refusing to answer certain questions when a witness in the juvenile court. The boy's refusals to answer were made upon the ground that by his answers he might incriminate himself.

On January 19, 1920, there was filed in the juvenile court for Los Angeles County a petition wherein it is charged that the minor, Bodo Tahbel, is a person defined in subdivisions 2, 4, 11, and 13 of section 1 of the "juvenile court law" (Stats. 1915, p. 1225 et seq.), and that he comes within the purview of section 1 of that act in that he has no parent or guardian willing to exercise proper parental control; that, by reason of the depravity of his parents, his home is an unfit place for him; that, by reason of the association of his parents with lewd and lascivious characters and the influence of his parents and of such characters, he is in danger of leading a lewd and immoral life; and further, that he has violated the criminal law of

this state, in that he did commit perjury, as defined in section 118 of the Penal Code, and did violate section 134 of the Penal Code by preparing a false paper and instrument in writing with intent to produce it in the superior court of Los Angeles County in the trial of the case of *People* v. *Otoman-Adusht-Zar-Ha'Nish*. The petition so filed in the juvenile court against the minor sets forth in detail the acts charged against him as an alleged violator of the two above-mentioned sections of the Penal Code, and prays that he be adjudged to be a ward of the juvenile court and be dealt with as provided in the juvenile court law.

Some time prior to the presentation of this petition of January 19, 1920, to the juvenile court, another petition had been filed therein against the minor, similar in all respects to that filed January 19, 1920, except that it did not charge the minor with the commission of any crime. The proceeding so initiated by the prior petition is still pending; though it seems that no formal judgment has as yet been entered therein adjudging the minor to be a ward of the juvenile court, the only order made in that proceeding being an order that the minor be allowed to remain in the custody of his father. He remained in his father's custody until the court, because of his refusal to answer the questions, ordered his detention in Juvenile Hall.

The second petition, that wherein the minor is charged with the commission of felonies—violations of sections 118 and 134 of the Penal Code—was referred to a duly appointed referee of the juvenile court to take testimony concerning the charges therein made against the minor, and to make report to the juvenile court. During the course of the proceedings before the referee, the minor was sworn as a witness and asked certain questions, which, on the advice of counsel representing him, he refused to answer, upon the ground that his answers would tend to incriminate him. At the hearing before us on this *habeas corpus* proceeding it was agreed by counsel on both sides that the questions which the witness refused to answer were such that answers thereto would tend to incriminate him. The referee reported to the juvenile court that the minor, when a witness before her, had refused to answer the questions so propounded to him, and set forth in her report facts tending to show the materiality of the evidence sought to be

elicited from the minor by the questions that he refused to answer. Upon the hearing of the referee's report, the judge of the juvenile court instructed the minor to answer the questions. The minor continuing his refusal, upon the ground that his answers might incriminate him, the juvenile court made the following order: "It is the order of this court that said witness, Bodo Tahbel, be committed to the custody of the superintendent of Juvenile Hall until he does answer said questions."

[1] Every person is subject to the power of the legislature to compel him in any judicial proceeding to give testimony of any fact within his knowledge and material to the issue, except in so far as the constitution restrains the exercise of this power or protects the individual from compulsory compliance with its attempted exercise. The constitution of this state has limited the extent to which the legislature may exercise its power, and has given the individual protection against its exercise by providing, in article I, section 13, that "no person shall be compelled in a criminal case to be a witness against himself."

[2] According to one of the oldest maxims of the common law, *nemo tenetur seipsum accusare,* any person, whether a party or stranger to the litigation, either in a civil action or a criminal prosecution, may, if he sees fit, refuse to answer any question the answer to which, if true, will render him punishable for crime, or which, in any degree, may tend to establish a public offense with which he might be charged. (Rapalje on Witnesses, sec. 261.) This principle of the common law doubtless had its birth in the abhorrence with which confessions coerced by inquisitorial torture were regarded alike in England and America. (8 R. C. L., p. 78.) Its soundness has seldom been questioned. And to-day it stands among the guaranties of personal liberty and security in all the constitutions, both of England and America.

[3] The words "criminal case," as used in section 13 of article I of the constitution, are broader than "criminal prosecution." To bring a person within the immunity of this provision, it is not necessary that the examination of the witness should be had in the course of a criminal prosecution against him, or that a criminal proceeding should have been commenced and be actually pending. It is suf-

ficent if there is a law creating the offense under which the witness may be prosecuted. If there is such a law, and if the witness may be indicted or otherwise prosecuted for a public offense arising out of the acts to which the examination relates, he cannot be compelled to answer in any collateral proceeding, civil or criminal, unless the law has absolutely secured him against any use in a criminal prosecution of the evidence he may give; and this can only be done by a statutory provision that, if he submits to the examination and answers the questions, he shall be exempt from criminal prosecution for any offense that may be disclosed as a consequence of his examination. (*Ex parte Clarke,* 103 Cal. 352, [37 Pac. 230]; *Counselmen* v. *Hitchcock,* 142 U. S. 547, [35 L. Ed. 1110, 12 Sup. Ct. Rep. 195, see, also, Rose's U. S. Notes]; *Karel* v. *Conlan,* 155 Wis. 221, [49 L. R. A. (N. S.) 826, 144 N. W. 266].) There has been no immunity law in this state since the repeal of section 1324 of the Penal Code that will justify a court in compelling a witness to give self-incriminatory evidence.

[4] The commitment of the witness to Juvenile Hall was, therefore, unlawful, unless, as suggested by counsel appearing here in opposition to the writ, justification for the detention can be found in the juvenile court law itself. After heedful consideration of all the points urged by counsel, we fail to see how the juvenile court law has attempted to, or, for that matter, could, justify the commitment to Juvenile Hall solely because of the boy's refusal to answer incriminating questions.

[5] It is suggested that a proceeding against a minor to have him adjudged a ward of the juvenile court is not a criminal proceeding, even though the violation of a penal law of the state be one of the grounds set forth in the petition therefor; that the law expressly declares that an order adjudging a minor to be a ward of the court shall in nowise be deemed to be a conviction of crime (section 5 of the act); that the proceeding is no more than one whereby it is sought to have the state, as *parens patriae,* supplant the natural parent as the child's custodian; and that, therefore, the minor is not being prosecuted for any crime and is in no danger of conviction of a public offense. The statute itself answers this contention. It does not follow, simply because the minor's alleged violation of a state law de-

fining a public offense is charged against him in a petition to have him adjudged a ward of the juvenile court, that he is not also liable to criminal prosecution and to punishment as for the commission of a crime. The juvenile court law expressly declares that, if a petition be filed in the juvenile court, seeking to have it adjudged that a minor be made a ward of the court because he has violated a penal law of the state, that court, at the hearing of the petition, or at any time thereafter, if it shall determine that such minor is not a fit and proper subject to be dealt with under the provisions of the act, "may dismiss the petition therein, and direct that such person be prosecuted under the general law." (Sec. 4c, Stats. 1915, p. 1228.) And section 10 of the act reads: "When any ward of the juvenile court under subdivision thirteen of section one of this act shall have been accused of a felony and no indictment or information shall have been filed, and said ward shall have been committed to either of said schools [the Whittier State School, the Preston School of Industry or the California School for Girls] and shall there prove to be incorrigible or not amenable to the discipline of said school, and shall be returned to the custody of the juvenile court, . . . it shall be the duty of the judge of said court to sit as a committing magistrate and hold the preliminary examination of such person, and if upon said hearing he shall determine. that there is probable cause to believe that the said person has committed the offense charged in the petition theretofore filed in said court, he shall hold such person to answer to the superior court, and thereupon the usual proceedings shall be had for the trial of said case in the superior court after the filing of the information in pursuance of said order of said judge sitting as a committing magistrate, and said person shall be tried by court and jury in the usual manner for the trial of a felony." (Stats. 1915, pp. 1233, 1234.)

But it is claimed, if we rightly understand the position of counsel appearing here in opposition to the writ, that if a minor refuse to answer a question upon the ground that he might incriminate himself, that fact alone warrants an order adjudging him to be a ward of the juvenile court, and as such amenable to an order of that court committing

him to a detention home or other suitable public institution. We have looked in vain for a provision in the juvenile court law that, by any possible stretch of the imagination, might justify such contention. It would have been strange indeed if the legislature had sought to visit a minor with the loss of his natural parents' society, guidance, and government merely because, forsooth, he had the temerity to invoke the protection of a constitutional guaranty incorporated into the state's organic law for the very purpose of safeguarding his personal liberty against the methods that obtained when confessions were extorted by inquisitorial abuses.

[6] It next is suggested that, if a minor has been duly adjudged to be a ward of the juvenile court, that tribunal, representing the state as *parens patriae,* may, like the natural parent, compel obedience to any order, and punish for disobedience. We understand that, as yet, the minor has not been formally adjudged to be a ward of the juvenile court by a judgment wherein findings upon the jurisdictional prerequisites have been made, as contemplated by section 2 of the act. But even had such judgment been made, and the minor had become a ward of the court in the full sense of the term, the court would not, for that reason, have the power to commit the ward to a detention home merely because the boy might see fit to exercise one of his constitutional prerogatives.

It is true, the right of liberty, secured by the guaranties of state and federal constitutions, is not that of entire unrestrainedness of action. For civil government itself implies an abridgment of natural liberty. And there are restrictions imposed upon personal liberty that spring from the helpless or dependent condition of individuals in various relations of life, among them being those of parent and child, guardian and ward, teacher and pupil. There are well-recognized powers of control in each of these relations over the actions of the child, ward or pupil, which may be exercised. These are legal and just restraints upon personal liberty, which the welfare of society demands, and which, where there is no abuse, are entirely consistent with the constitutional guaranty of liberty. Where the restraints imposed by statute upon this class of dependents are such as are essential to the welfare of society and to the comfort

and well-being of the unfortunates who come within the purview of the statute, there is no infringement of personal liberty. As we read it, the juvenile court law has not attempted to impose any unlawful restraint upon personal liberty. It is not its purpose to impose unnecessary restraint upon the unfortunates whose care it commits to the juvenile court. Much less is it its purpose to impose upon any of them a degree of restraint amounting to imprisonment in a detention home merely because the ward may have sought the protection of a constitutional guaranty. The purpose of the act is to afford a protecting hand to unfortunate boys and girls who, by reason of their own conduct, evil tendencies, or improper environment, have proven that the best interests of society, the welfare of the state, and their own good demand that the guardianship of the state be substituted for that of the natural parents. To accomplish that purpose the statute should be given a broad and liberal construction. But no construction of the act should be adopted that will cause it to clash with any of those constitutional safeguards that have been incorporated into the state's organic law for the purpose of securing to all protection against possible abuses, inquisitorial or otherwise. We are firmly convinced that the liberty of a ward of the juvenile court, restricted to a great extent, as it necessarily must be, cannot be further restrained, as, for example, by confinement in a public institution, solely and simply because the ward chooses to stand steadfastly by a right guaranteed to him by the fundamental law of the state. An order committing him to a detention home for that cause, and that cause only, is an abuse of discretion. The exercise of such a power, if sanctioned, would, in its practical effects, be tantamount to the coercion of a confession of crime. True, the design of the act is salutary, and every effort should be made to further its legitimate purposes. But never should it be made an instrument for the denial of a constitutional right, even though the person seeking refuge in the asylum afforded him by the invocation of that right be but a poor, unfortunate minor, who, by reason of his evil tendencies or improper environment, must be taken from the sole care and custody of his own natural parents and placed under the control of the court as its ward.

Finally, it is suggested that the order under which the minor is detained in Juvenile Hall is not an order adjudging him guilty of contempt. Whether the order whereby Bodo Tahbel was taken from his father's custody and deprived of his liberty by being placed in a detention home be regarded as a contempt order, or whether it be characterized by some other designation, the fact remains that this boy was taken from the custody of his parent and committed to Juvenile Hall, there to remain until he should surrender his constitutional right to refuse to give self-incriminatory evidence. Without doubt, the juvenile court, where the welfare of the minor requires it, has the power to commit a ward of the court to a detention home. But such a power, unquestionably lawful when the welfare of the child necessitates it and when its exercise is governed by a wise and sound discretion, cannot be made the pretext for the punishment of the child merely because he elects to stand upon a constitutional right. Section 9b of the act reads: ''No ward of the juvenile court, as defined in this act, shall be taken from the custody of his parent or legal guardian, without the consent of such parent or guardian, unless the court shall find such parent or guardian to be incapable of providing, or to have failed or neglected to provide proper maintenance, training and education for said person; or unless said person has been tried on probation in said custody and has failed to reform; or unless said person has been convicted of crime by a jury; or unless the court shall find that the welfare of said person requires that his custody be taken from said parent or guardian.'' The welfare of a ward does not require that his custody be taken from his natural parent or guardian simply because he has invoked the protecting Aegis of the constitution.

The commitment to the juvenile hall was illegal, and the minor should be discharged from detention therein.

It is so ordered.

Sloane, J., and Thomas, J., concurred.